# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Shawonder Scott, Appellant,

v.

Curtis McAlister, Acquana McAlister, Norma L. Cyrus, Tax Collector for Williamsburg County, the County of Williamsburg, an Unincorporated Subdivision of the State of South Carolina, Hartwell Pendergrass, Sr., and Hattie S. Pendergrass, Defendants,

Of whom Norma L. Cyrus, Tax Collector for Williamsburg County, and the County of Williamsburg, an Unincorporated Subdivision of the State of South Carolina, are the Respondents.

Appellate Case No. 2019-000030

Appeal From Williamsburg County
George M. McFaddin, Jr., Circuit Court Judge

Opinion No. 5897
Heard October 14, 2021 – Filed March 9, 2022

**AFFIRMED**

Dwight Christopher Moore, of Moore Law Firm, LLC, of Sumter, for Appellant.

William E. Jenkinson, III and William Evan Reynolds, both of Jenkinson, Kellahan, Thompson & Reynolds, PA, of Kingstree, for Respondents.

**KONDUROS, J.:** Shawonder Scott appeals the circuit court's grant of summary judgment in favor of Norma L. Cyrus in her capacity as Tax Collector for Williamsburg County (Tax Collector) and Williamsburg County (collectively, Respondents). Scott contends Respondents violated section 12-51-40 of the South Carolina Code (2014 & Supp. 2021) by not providing her with notice of the delinquent taxes, tax sale, or redemption opportunity for property she claims she was renting to own. Scott asserts the circuit court erred by determining she lacked standing and Respondents did not owe her any duty because she was not the defaulting taxpayer of record, owner, or the grantee of record.[1] We affirm.

## FACTS

In 1998, Scott and her uncle, McAlister, allegedly entered into an oral contract for the purchase of residential real estate located at 196 Gausetown Road in Kingstree, South Carolina (the Property) for $35,000. Scott took possession of the Property after providing an initial down payment of $4,000. According to Scott, she agreed to pay the remaining $31,000 in monthly installments of $300.

Conversely, McAlister contended Scott agreed to obtain a loan in order to make a second payment of $31,000. After Scott failed to make a second payment of $31,000, McAlister asserted he told her that she was no longer purchasing the Property and her additional payments were rent. However, McAlister maintained that he would have accepted the remaining balance "in 1998, 1999, or 2000 or at any time after that."[2] Regardless of how the payments were characterized, both parties later agreed to reduce Scott's monthly payments to $200[3] and arranged for Scott to pay the Property's taxes instead of rent if McAlister was unable to afford them.

---

[1] Scott's action against the former owner and record taxpayer Curtis McAlister (McAlister), his daughter Aquana McAlister (Aquana), the current owner Hattie S. Pendergrass (Pendergrass), and her husband Hartwell Pendergrass, Sr. (Hartwell) is not before us.

[2] Additionally, Respondents' brief states the $31,000 remaining balance was to be paid in monthly installments.

[3] McAlister only received $188 from each of Scott's $200 payments due to Western Union's banking fees, but Scott contended that McAlister agreed to the arrangement.

In 2007, McAlister commenced eviction proceedings against Scott, alleging she failed to make her monthly payments, and the magistrate court issued an order of ejectment. Scott appealed, asserting she occupied the Property under a land purchase agreement, and the circuit court vacated the order of ejectment. In 2010, McAlister's daughter, Aquana, attempted to get Scott to sign a lease agreement. Scott denied she was renting the Property and refused to sign the document. McAlister then commenced a second ejection action in magistrate court. The Record does not indicate the result of the second eviction action.

Meanwhile, McAlister began living with Aquana in Columbia. While living in Columbia, McAlister suffered a heart attack and stroke. Pursuant to Aquana's telephone requests,[4] Respondents changed the Property's mailing address on October 20, 2010, to a post office box in Columbia, and on June 29, 2011, to Aquana's address in Columbia. The Property's 2011 taxes and late payment penalties totaling $449.35 were never paid. In preparation for the Property's tax sale, Respondents conducted a title search that showed McAlister was the Property's sole owner and taxpayer. Pendergrass[5] purchased the Property at a tax sale on December 3, 2012, and Respondents executed a tax deed conveying the Property to her for $800 on September 9, 2014.

Scott claimed she was unaware of the Property's mailing address changes, delinquent taxes, tax sale, or redemption opportunity until Pendergrass's husband, Hartwell, and a land surveyor entered the Property in 2014 after its conveyance. Shortly after, Scott drove McAlister from Columbia to Tax Collector's office in Williamsburg County, where they talked to Tax Collector. Tax Collector informed Scott and McAlister of the Property's mailing address changes,[6] tax sale for delinquent 2011 taxes, and expired redemption opportunity.

---

[4] McAlister and Aquana (collectively, the McAlisters) assert they made the address change request together in person. However, Williamsburg County Assessor's Office (Assessor's Office) policy at that time allowed anyone to change a property's mailing address, and witnesses for Respondents stated the address change forms indicated Aquana made both requests by phone.

[5] McAlister's deceased brother, George McAlister, was married to Pendergrass's sister, Pauline McAlister.

[6] Again, the McAlisters maintained they made the change to the Property's mailing address in person. However, Scott contended that McAlister was unaware of the changes before talking to Tax Collector.

In 2015, Scott filed a complaint alleging, *inter alia*, Respondents violated section 12-51-40 because they mailed notice to the Property's updated mailing address rather than its physical address and they failed to post notice on the Property.[7] Scott contended Respondents' violation of section 12-51-40 prevented her from receiving notice of the Property's delinquent taxes, tax sale, or redemption opportunity. As a result, Scott claimed "[s]he [was] denied the opportunity to pay the [Property's] delinquent taxes and protect her interest in the [P]roperty." Scott also claimed she suffered "harassment, humiliation, embarrassment, anxiety, mental anguish, emotional distress, inconvenience[,] and . . . incur[red] legal fees and costs to protect her interest in the [P]roperty." Scott asserted she was entitled to a court order that voided the Property's tax sale, set aside the tax deed to Pendergrass, and awarded actual damages.[8]

The parties conducted discovery, which included depositions of Scott, the McAlisters, Tax Collector, another employee in Tax Collector's office, and an employee in Assessor's Office. Tax Collector claimed her office sent notices of the delinquent taxes to the Property's updated mailing address in Columbia first by regular mail, then by certified mail. After the certified mail was returned to Respondents as unclaimed, Tax Collector asserted an employee[9] posted the required notice on the Property on August 14, 2012. However, McAlister claimed he never received the mailed notices,[10] and both McAlister and Scott asserted the notice was never posted on the Property.

The parties' discovery also produced a 2002 tax bill for $127.67 with a handwritten note dated November 8, 2004. The note, allegedly written by McAlister, stated

---

[7] The complaint also included causes of action for breach of contract, breach of trust, and civil conspiracy against the McAlisters, Pendergrass and Hartwell (collectively, the Pendergrasses). Again, these actions are not before us.

[8] At oral argument, Scott's attorney stated favorable decisions by this court and a jury on remand would allow Respondents to void the tax sale, but did not mention monetary damages.

[9] Scott's attorney asserted at oral argument the employee, Joshua Gaskins, could not be located.

[10] Initially, McAlister stated he thought he received the notices regarding the Property's taxes, delinquency, and tax sale. However, he later claimed he could not recall receiving any documents from Respondents after 2010. Aquana claimed she and McAlister did not receive any documents regarding the Property's tax sale at her Columbia address, but recalled receiving one tax notice; however, she could not remember whether it was for the 2010 or 2011 tax year or if she paid it.

Scott was the owner and taxpayer for the Property.[11]  However, the origin of the annotated tax bill is uncertain from the record.  McAlister denied writing the note, particularly in light of his name being misspelled twice.  Additionally, neither Scott nor the three Williamsburg County employees were asked to confirm if they had ever seen the annotated tax bill or whether it was in their files.

Respondents filed a motion for summary judgment on June 28, 2018.  Respondents asserted they were entitled to judgment as a matter of law pursuant to Rule 56 of the South Carolina Rules of Civil Procedure because the pleadings, depositions, and evidence lacked a genuine issue of material fact based on the South Carolina public duty doctrine and applicable South Carolina case law regarding that doctrine and its special duty exception.  At the September 27, 2018 pretrial motions hearing, Respondents conceded they owed McAlister a special duty to provide him notice of the Property's tax sale; however, Respondents maintained they did not owe Scott that special duty because she was not the record taxpayer, owner, or grantee.

On December 11, 2018, the circuit court granted summary judgment to Respondents after determining Scott lacked standing and Respondents did not owe her any duty under section 12-51-40 because she was not the record taxpayer, owner, or grantee for the property.  The order did not address any other defendant.[12]  Scott contends that a favorable decision from this court would allow her to go back to trial and attempt to void the tax sale to Pendergrass and compel specific performance from McAlister upon a favorable jury verdict.  This appeal followed.

**STANDARD OF REVIEW**

"The purpose of summary judgment is to expedite the disposition of cases which do not require the services of a fact finder."  *Wright v. PRG Real Est. Mgmt., Inc.*, 426 S.C. 202, 211, 826 S.E.2d 285, 290 (2019) (quoting *George v. Fabri*, 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001)).  "When reviewing a grant of a summary

---

[11] The annotation reads: "I Curtis McCalister [sic] gets [sic] payment from Ms. Shawonder for house, renting to own[.]  She is owner of house[,] she pays taxes on property[.]"  The note is signed "Curtis McCalister [sic]."

[12] The current status of Scott's action against the McAlisters and the Pendergrasses is unclear from the record.  When asked about the status of Scott's action against McAlister at oral argument, Scott's attorney responded that "some things have happened outside the record."

judgment, appellate courts apply the same standard applied by the trial court pursuant to Rule 56(c), SCRCP." *Id.* (quoting *Turner v. Milliman*, 392 S.C. 116, 121-22, 708 S.E.2d 766, 769 (2011). "[A] circuit court shall grant summary judgment 'if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Id.* (second omission by court) (quoting Rule 56(c), SCRCP).

In determining whether a genuine issue of fact exists, "a court must view the facts in the light most favorable to the non-moving party." *Id.* (quoting *George*, 345 S.C. at 452, 548 S.E.2d at 874). "[I]n cases applying the preponderance of the evidence burden of proof, the non-moving party is only required to submit a mere scintilla of evidence in order to withstand a motion for summary judgment." *Hancock v. Mid-South Mgmt. Co.*, 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009)). "A court considering summary judgment neither makes factual determinations nor considers the merits of competing testimony; however, summary judgment is completely appropriate when a properly supported motion sets forth facts that remain undisputed or are contested in a deficient manner." *David v. McLeod Reg'l Med. Ctr.*, 367 S.C. 242, 250, 626 S.E.2d 1, 5 (2006).

## LAW/ANALYSIS

Scott asserts the circuit court erred by granting Respondents' summary judgment motion because the Record reflected genuine issues of material fact when viewing the facts in the light most favorable to her. Scott contends the property interest she acquired through her contract with McAlister entitled her to notice of the Property's delinquent taxes, tax sale, and redemption opportunity pursuant to section 12-51-40. Scott maintains the Record contained at least a scintilla of evidence that Respondents failed to comply with section 12-51-40 by mailing the delinquency notices to the Property's updated mailing address rather than the Property's physical address and by failing to post notice of the Property's pending tax sale on the Property. We disagree.[13]

"A tax execution is not issued against the property, it is issued against the defaulting tax[]payer." *Rives v. Bulsa*, 325 S.C. 287, 293, 478 S.E.2d, 878, 881

---

[13] Scott's complaint asserts Respondents violated the notice requirements of section 12-51-40. Her requested relief to void the tax sale and to receive other monetary damages raises a question as to the precise nature of her claim. However, under any interpretation she is not a taxpayer or grantee of record as contemplated by the statute and cannot therefore pursue a claim against Respondents.

(Ct. App. 1996). "Due process of law requires some sort of notice to a landowner before he is deprived of his property." *Id.* "Tax sales must be conducted in strict compliance with statutory requirements." *In re Ryan Inv. Co.*, 335 S.C. 392, 395, 517 S.E.2d 692, 693 (1999). "[A]ll requirements of the law leading up to tax sales [that] are intended for the protection of the taxpayer against surprise or the sacrifice of his property are to be regarded [as] mandatory and are to be strictly enforced." *Forfeited Land Comm'n of Bamberg County v. Beard*, 424 S.C.137, 145, 817 S.E.2d 801, 804 (Ct. App. 2018) (alterations in original) (quoting *Donohue v. Ward*, 298 S.C. 75, 83, 378 S.E.2d 261, 265 (Ct. App. 1989)). "Failure to give the required notice [of a tax sale] is a fundamental defect in the tax proceedings which renders the proceedings absolutely void." *Rives*, 325 S.C. at 293, 478 S.E.2d at 881.

Section 12-51-40 provides the procedural process officials must follow after a taxpayer defaults on taxes for real property. Under section 12-51-40, the officer authorized to collect delinquent taxes, assessments, penalties, and costs must levy an execution by distress and sell the defaulting taxpayer's real property that generated all or part of the delinquent tax to satisfy the taxes, assessments, penalties, and costs. First, the officer must mail a notice of delinquent property taxes "to the *defaulting* taxpayer and to a grantee *of record* of the property, whose value generated all or part of the tax." § 12-51-40(a) (emphases added). The officer is required to mail the notice to "the best address available, which is either the address shown on the deed conveying the property to him, the property address, or other corrected or forwarding address of which the officer . . . has actual knowledge." *Id.*

If the taxes remain unpaid thirty days after the delinquent notice was mailed, the officer is directed to take exclusive possession of real property by mailing the delinquent notice again by "certified mail, return receipt requested-restricted delivery" to "the *defaulting* taxpayer and *any* grantee *of record* of the property." § 12-51-40(b) (emphases added). The officer is required to send the certified mail to "the address shown on the tax receipt or to an address of which the officer has actual knowledge." *Id.* If the certified mail is returned as undelivered, the officer is directed to post a notice in one or more conspicuous places on the delinquent property that reads, "Seized by person officially charged with the collection of delinquent taxes of (name of political subdivision) to be sold for delinquent taxes." § 12-51-40(c). This posting "is equivalent to levying by distress, seizing, and taking exclusive possession of [the property]." *Id.*

A grantee is "[o]ne to whom property is conveyed." *Grantee*, *Black's Law Dictionary* (11th ed. 2019). Chapter 51 does not define taxpayer; however, chapter 60 defines a taxpayer as "a person who is liable for a tax or who is responsible for collecting and remitting a tax." S.C. Code Ann. § 12-60-30(29) (2014). Additionally, chapter 60 defines a property taxpayer as "a person who is liable for, or whose property or interest in property, is subject to, or liable for, a property tax imposed by this title." S.C. Code Ann. § 12-60-30(22) (2014). Further, section 12-37-610 of the South Carolina Code, titled "[p]ersons liable for taxes and assessments on real property," states:

> Each person is liable to pay taxes and assessments on the real property that . . . he owns in fee, for life, or as trustee, *as recorded* in the public records for deeds of the county in which the property is located, or on the real property that . . . he has care of as guardian, executor, or committee or may have the care of as guardian, executor, trustee, or committee.

S.C. Code Ann. § 12-37-610 (2014) (emphasis added).

The circuit court did not err by granting Respondents' summary judgment motion. First, Scott alleges that Respondents violated section 12-51-40(a) and (b) because they mailed the notices to the Property's updated mailing address rather than the Property's physical address. Section 12-51-40(a) requires the officer to mail notice of the tax sale "to the *defaulting* taxpayer and to a grantee *of record* of the property, whose value generated all or part of the tax." § 12-51-40(a). Similarly, section 12-51-40(b) requires the officer to send notice of the tax sale by certified mail to "the *defaulting* taxpayer and any grantee *of record* of the property."[14] § 12-51-40(b).

Here, Scott was never a defaulting taxpayer or a grantee of record of the Property. Scott testified McAlister was responsible for paying the Property's taxes and conceded she was never a grantee of record. Additionally, county records indicated McAlister was the only defaulting taxpayer and grantee of record for the Property. Consequently, Scott was not entitled to receive mailed notice under

---

[14] Section 12-51-40 was amended in 2000 to substitute "current owner" with "defaulting taxpayer" and "grantee" of record. *See* S.C. Code Ann. § 12-51-40 (1998) (prior to the 2000 amendment); Act No. 399, § 3(X)(3), 2000 S.C. Acts 3471-73 (amending section 12-51-40, effective January 1, 2001).

12-51-40(a) or (b), regardless of the propriety of the changes to the Property's mailing address.

Scott also asserts that Respondents violated section 12-51-40(c) by failing to conspicuously post notice of the impending tax sale on the Property. Section 12-51-40(c) requires the officer to post notice of the tax sale on the delinquent property if the certified mail required under section 12-51-40(b) is returned as undelivered. § 12-51-40(c). "Ordinarily, under South Carolina's public duty doctrine, public officials are 'not liable to individuals for their negligence in discharging public duties [because] the duty is owed to the public at large rather than [to] anyone individually.'" *Tanner v. Florence Cnty. Treasurer*, 336 S.C. 552, 561, 521 S.E.2d 153, 158 (1999) (second alteration in original) (quoting *Jensen v. Anderson Cnty. Dep't of Soc. Servs.*, 304 S.C. 195, 199, 403 S.E.2d 615, 617 (1991)). However, our supreme court has recognized exceptions to the public duty doctrine for statutes that create a special duty to particular individuals.[15] *Id.* at 562, 521 S.E.2d at 158.

In *Tanner*, Florence County sold property at a delinquent tax sale while the owner was incarcerated. *Id.* at 556, 521 S.E.2d at 155. The owner alleged he did not receive the notice required under section 12-51-40 despite giving Florence County his prison address. *Id.* Our supreme court noted it had been reluctant to find special duties imposed by statutes. *Id.* at 562, 521 S.E.2d at 158. However, our

---

[15] The court in *Tanner* noted:

> [A] 'special duty' to particular individuals may be created by . . . a statute when: (1) an essential purpose of the statute is to protect against a particular kind of harm; (2) the statute, either directly or indirectly, imposes on a specific public officer a duty to guard against or not cause that harm; (3) the class of persons the statute intends to protect is identifiable before the fact; (4) the plaintiff is a person within the protected class; (5) the public officer knows or has reason to know of the likelihood of harm to members of the class if he fails to do his duty; *and* (6) the officer is given sufficient authority to act in the circumstances or he undertakes to act in the exercise of his office.

*Id.* at 562, 521 S.E.2d at 158 (emphasis added).

supreme court recognized that "[a]ll requirements of law leading up to tax sales are intended *for the protection of the taxpayer* against surprise or the sacrifice of his property . . . ." *Id.* at 563, 521 S.E.2d at 158-59 (emphasis added). Accordingly, our supreme court held that "[a]s a notice provision, section 12-51-40 creates a special duty." *Id.* at 563, 521 S.E.2d at 159. Still, our supreme court cautioned that "every failure of *a delinquent taxpayer* to receive notice does not automatically qualify for the special duty exception to the public duty doctrine." *Id.* (emphasis added). Our supreme court elaborated that the special duty exception to section 12-51-40 arises "*only* in cases . . . where *the delinquent taxpayer* asserts that he provided the [c]ounty his correct address and the [c]ounty failed to use that address." *Id.* (emphases added).

In *Taylor v. Mill*, real property that had been sold at a federal tax sale to one purchaser was subsequently sold at a county tax sale to a different purchaser. 310 S.C., 526, 527, 426 S.E.2d 311, 312 (1992). The initial purchaser did not notify the county that he was the grantee of the delinquent taxpayer or record his deed before the property was sold at the county tax sale. *Id.* at 527-28, 426 S.E.2d at 312-13. As a result, our supreme court concluded the county "had no obligation to notify [the initial purchaser] of the county tax sale under [section 12-51-40]." *Id.* at 528, 426 S.E.2d at 312-13.

Here, unlike the plaintiff in *Tanner*, Scott was never the defaulting taxpayer or a grantee of record for the Property. While Scott occasionally paid the Property's taxes in lieu of her regular payment to McAlister at his request, the Record is devoid of the number and amount of the Property's tax payments Scott made on McAlister's behalf. Neither Scott nor McAlister provided canceled checks or receipts that showed Scott paid the Property's taxes for any year. Notably, Scott conceded McAlister was responsible for paying the Property's taxes.

Even assuming Scott ordinarily paid the Property's taxes directly to Williamsburg County, her payments were simply on behalf of the taxpayer, McAlister, and in lieu of her monthly payments to McAlister. The fact that Scott's payments to McAlister were accomplished by paying the Property's taxes did not make Scott a taxpayer because she was never liable for the tax; again, Scott conceded McAlister was responsible for paying the Property's taxes. *See* § 12-60-30(29) ("'Taxpayer' means a person who is liable for a tax or who is responsible for collecting and remitting a tax."). Indeed, McAlister remained the only taxpayer of record even after the 2004 note on the 2002 tax bill and two changes to the Property's mailing address.

Moreover, Respondents had no way of knowing that Scott had an interest in the Property. Like the initial purchaser in *Taylor*, Scott did not record her contract with McAlister or a deed listing her as a grantee of the Property with Williamsburg County's register of deeds. Additionally, Scott was never added as a taxpayer on any county document, and McAlister remained the only taxpayer after Aquana changed the mailing address for the Property in the two years before the tax sale. Notably, Scott conceded that Respondents would have no way of knowing she was supposed to have owned the Property because her name was not on the deed. Thus, like the county in *Taylor*, Respondents were not obligated to notify Scott of the Property's delinquent taxes, tax sale, or redemption opportunity under section 12-51-40.

Additionally, the handwriting on the bottom of the 2002 tax receipt does not even raise a mere scintilla of evidence that Scott was an identifiable taxpayer. The Record contained no indication Respondents were aware of the annotated tax bill or in possession of it. Moreover, the annotation did not contain a mailing address, the Property's tax bills for the following eight years were sent to McAlister and paid in McAlister's name, McAlister denied writing the note, and McAlister's name is spelled wrong twice in the annotation. *See Crosby v. Seaboard Air Line Ry.*, 81 S.C. 24, 31, 61 S.E. 1064, 1067 (1908) ("[A] scintilla of evidence is any material evidence which, taken as true, would tend to establish the issue in the mind of a reasonable juror."); *Priest v. Brown*, 302 S.C. 405, 408-09, 396 S.E.2d 638, 639-40 (Ct. App. 1990) ("The [court] is not required to single out some one morsel of evidence and attach to it great significance when patently the evidence is introduced solely in a vain attempt to create an issue of fact that is not genuine."). Consequently, no document in the Record indicated Respondents were aware that Scott had an interest in the Property because McAlister remained the only record taxpayer, owner, and grantee. Thus, Respondents did not owe Scott a special duty under section 12-51-40. *See Taylor*, 310 S.C. at 528, 426 S.E.2d at 312-13 (finding that the county had no obligation under section 12-51-40 to notify the purchaser of property sold at a federal tax sale of its subsequent county tax sale because he did not notify the county he was the grantee of the delinquent taxpayer or record his deed).

Sadly, the crux of Scott's argument is that she would have paid the delinquent taxes and saved her home regardless of her status regarding the Property if she had known the Property was in danger of foreclosure. While equity may favor her in the confusion as to what her ownership status was regarding the Property, her argument is dependent on her asserting McAlister's rights under section 12-51-40, not her own.

**CONCLUSION**

Accordingly, the circuit court did not err by granting Respondents' motion for summary judgment. Therefore, the circuit court is

**AFFIRMED.**

**HILL and HEWITT, JJ., concur.**